## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DENISH BHAVSAR and SAMHITA GERA, derivatively on behalf of DESKTOP METAL, INC.,

Plaintiffs,

vs.

RIC FULOP, JAMES HALEY, ALI EL SIBLANI, SCOTT DUSSAULT, JAMES EISENSTEIN, DAYNA GRAYSON, LEO HINDERY, JR., WEN HSIEH, JEFF IMMELT, BYRON KNIGHT, STEPHEN NIGRO, STEVE PAPA, ANDY WHEELER, and BILAL ZUBERI,

Defendants,

and

DESKTOP METAL, INC.,

Nominal Defendant.

Case No.:

**JURY TRIAL DEMANDED**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiffs Denish Bhavsar and Samhita Gera ("Plaintiffs"), by and through Plaintiffs' counsel, derivatively on behalf of Nominal Defendant Desktop Metal, Inc. ("Desktop Metal" or the "Company"), file this Verified Shareholder Derivative Complaint against Ric Fulop ("Fulop"), James Haley ("Haley"), Ali El Siblani ("El Siblani"), Scott Dussault ("Dussault"), James Eisenstein ("Eisenstein"), Dayna Grayson ("Grayson"), Leo Hindery, Jr. ("Hindery"), Wen Hsieh ("Hsieh"), Jeff Immelt ("Immelt"), Byron Knight ("Knight"), Stephen Nigro ("Nigro"), Steve Papa ("Papa"), Andy Wheeler ("Wheeler"), and Bilal Zuberi ("Zuberi") (collectively, the "Individual Defendants," and together with Desktop Metal, the "Defendants") for breaches of their fiduciary

duties as directors and/or officers of Desktop Metal, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), SEC Rule 14a-9, and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange commission ("SEC") filings, wire and press releases published by and regarding Desktop Metal, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from March 15, 2021 to November 15, 2021, both dates inclusive (the "Relevant Period").

2.     Desktop Metal is a Delaware corporation based in Massachusetts that designs and markets 3D printing systems.[1] The Company is the result of a business combination that closed in December 2020 with Desktop Metal Operating Inc. f/k/a Desktop Metal, Inc. ("Legacy Desktop") (the "Business Combination"); prior to the Business Combination, the Company went by the name Trine Acquisition Corp. ("Trine"). The Company's platforms include: *Production System*, a

---

[1] https://fortune.com/2016/04/26/term-sheet-tuesday-april-26/

manufacturing platform which utilizes Desktop Metal's Single Pass Jetting technology to enable production quantities of up to millions of parts per year; *Shop System*, a turnkey metal binder jetting system to bring metal 3D printing to machine and job shops; *Studio System*, an office-friendly metal 3D printing system; and *Fiber*, a desktop 3D printer which utilizes Desktop Metal's proprietary Micro Automated Fiber Placement.

3.      On February 16, 2021, Desktop Metal acquired EnvisionTEC, Inc. and certain of its affiliates (collectively, "EnvisionTEC"), a provider of volume production photopolymer 3D printing solutions for end use parts.

4.      On November 8, 2021, after the market closed, Desktop Metal announced the resignation of EnvisionTec US LLC's Chief Executive Officer ("CEO") and further disclosed that it was conducting an internal investigation into certain matters, including "manufacturing and product compliance practices and procedures with respect to a subset of its photopolymer equipment and materials at its EnvisionTec US LLC facility."

5.      On this news, the Company's stock price fell $0.39 per share, or 4.24%, from a closing price of $9.20 per share on November 8, 2021 to close at $8.81 per share on November 9, 2021.

6.      On November 15, 2021, after the market closed, Desktop Metal filed its Form 10-Q with the SEC for the quarterly period ended September 30, 2021 (the "3Q21 10-Q"), in which the Company disclosed that it would notify the U.S. Food and Drug Administration ("FDA") of "compliance issues with certain shipments of EnvisionTEC's Flexcera dental resins and its PCA4000 curing box."

7.      On this news, the Company's stock price fell $1.19 per share, or 14.84%, from a closing price of $8.02 per share on November 15, 2021 to close at $6.83 per share on November

16, 2021. Additionally, an unusually heavy volume of stocks was also traded – nearly twice the typical number of shares that had been trading.

8.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures; (2) the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.      The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

10.     Additionally, the Individual Defendants breached their fiduciary duties by failing to maintain adequate internal controls.

11.     In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, its Chief Financial Officer ("CFO"), and one of its directors to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts captioned *Luongo v. Desktop Metal, Inc., et. al.,* Case No. 1:21-cv-12099 (the "Securities Class Action"), and which has further subjected the Company to the need to undertake

4

internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendant Fulop, Defendant Haley, and Defendant El Siblani's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Sections 10(b) and 21D of the Exchange Act. Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs alleged of herein occurred in this District, the Defendants have conducted business in this District, and the Defendants have received substantial compensation by engaging in numerous activities that have had an effect in this District.

## PARTIES

### Plaintiffs

18.     Plaintiffs are current shareholders of Desktop Metal. Plaintiffs have continuously held Desktop Metal common stock since they acquired it in December 2020. On September 10, 2020, Plaintiffs purchased Trine Acquisition Corp. stock, which was converted into such Desktop Metal stock in December 2020.

### Nominal Defendant Desktop Metal

19.     Nominal Defendant Desktop Metal is a Delaware corporation with its principal executive offices located at 63 3rd Avenue, Burlington, MA 01803. Desktop Metal's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "DM."

### Defendant Fulop

20.     Defendant Fulop has served as the Company's CEO and Chairman of the Board since December 2020. He previously served as the CEO of Legacy Desktop Metal from its incorporation in 2015 until the Business Combination. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 25, 2023 (the "2023 Proxy Statement"), as of April 10, 2023, Defendant Fulop beneficially owned 22,173,559 shares of the Company's Class A common stock, representing 6.91% of the Company's total outstanding Class A Common Stock as of that date. Given that the price per share of the Company's stock at the close of trading

on April 10, 2023 was $2.25, Defendant Fulop beneficially owned approximately $49,890,508 worth of Desktop Metal stock.

21.     For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Fulop received $11,034,910 in total compensation from the Company. This included $522,500 in salary, $10,018,870 in stock awards, $493,000 in non-equity incentive plan compensation, and $540 in all other compensation.

22.     The Company's 2023 Proxy Statement stated the following about Defendant Fulop:

***Ric Fulop***
Mr. Fulop has served as our Chief Executive Officer and Chairman of our Board of Directors since December 2020. Prior to that, Mr. Fulop served as the Chief Executive Officer of Legacy Desktop Metal from its incorporation in 2015. Prior to the founding of Legacy Desktop Metal, Mr. Fulop was a general partner at North Bridge Venture Partners from 2010 to 2015 and served as a Founder of A123 Systems, Inc. from 2001 to 2010. Mr. Fulop currently serves on the board of governors of World Economic Forum Advanced Manufacturing Initiative (nonprofit). Mr. Fulop holds an M.B.A. from the MIT Sloan School of Management.

## **Defendant Haley**

23.     Defendant Haley served as the Company's CFO and Treasurer from February 2021 until he resigned effective December 2022. Prior to his resignation, he served as the Vice President ("VP") of Finance of Legacy Desktop Metal from August 2020 until February 2021. According to the 2023 Proxy Statement, as of April 10, 2023, Defendant Haley beneficially owned 100,000 shares of the Company's Class A common stock. Given that the price per share of the Company's stock at the close of trading on April 10, 2023 was $2.25, Defendant Haley beneficially owned approximately $225,000 worth of Desktop Metal stock.

24.     For the 2021 Fiscal Year, Defendant Haley received $8,345,733 in total compensation from the Company. This included $376,208 in salary, $150,000 in bonuses,

$7,622,500 in stock awards, $196,500 in non-equity incentive plan compensation, and $525 in all other compensation.

25.　　The Company's proxy statement filed on Schedule 14A with the SEC on April 27, 2022 (the "2022 Proxy Statement") stated the following about Defendant Haley:

> **James Haley**
> Mr. Haley has served as our Chief Financial Officer and Treasurer since February 12, 2021. Mr. Haley previously served as the Company's Vice President of Finance from December 2020. Prior to that, Mr. Haley served as the Vice President of Finance of Desktop Metal Operating, Inc., the company formerly known as Desktop Metal, Inc. that was acquired by the Company ("Legacy Desktop Metal"), since August 2020. Prior to joining Legacy Desktop Metal, Mr. Haley was Vice President, Controller as Minerva Neuroscience, Inc. from June 2015 to October 2020, as Vice President and Finance and Treasurer of NEC Energy Solutions from May 2014 to June 2015, and as Director of Financial Reporting and Analysis of A123 Systems, Inc. from January 2008 to May 2014. Mr. Haley holds a B.A. in Management from Curry College and an M.B.A. from Northeastern University.

### **Defendant El Siblani**

26.　　Defendant El Siblani served as a Company director from February 2021 to November 2021. He previously served as the CEO of EnvisionTEC US LLC from 2002 to November 2021. According to the proxy statement the Company filed on Schedule 14A with the SEC on June 17, 2021 (the "2021 Proxy Statement"), as of April 12, 2022, Defendant El Siblani beneficially owned 5,036,142 shares of the Company's common stock, representing 1.61% of the Company's total outstanding Class A Common Stock as of that date. Given that the price per share of the Company's stock at the close of trading on April 12, 2022 was $4.50, Defendant El Siblani beneficially owned approximately $22,662,639 worth of Desktop Metal stock.

27.　　For the 2021 Fiscal Year, Defendant El Siblani received $5,837,975 in total compensation from the Company. This included $414,000 in salary, $5,009,435 in stock awards, and $414,540 in all other compensation.

28.     The Company's 2021 Proxy Statement stated the following about Defendant El Siblani:

> **_Ali El Siblani_**
> Mr. El Siblani has served as our Chief Executive Officer of EnvisionTec US LLC and as a member of our Board of Directors since we acquired the EnvisionTec Group in February 2021. Previously Mr. Siblani had been the founder and Chief Executive Officer of EnvisionTec US LLC since 2002. Prior to that, Mr. Siblani founded Sibco, Inc., a provider of services and materials for the rapid prototyping industry. Mr. Siblani holds a B.S. from Lawrence Technological University and an M.S.E.E. from Wayne State University. We believe Mr. Siblani is qualified to serve on our Board of Directors due to his extensive entrepreneurial and management experience and leadership in the additive manufacturing market.

### Defendant Dussault

29.     Defendant Dussault has served as a Company director since December 2020. He also serves as the Chair of the Audit Committee. According to the 2023 Proxy Statement, as of April 10, 2023, Defendant Dussault beneficially owned 60,085 shares of the Company's Class A common stock. Given that the price per share of the Company's stock at the close of trading on April 10, 2023 was $2.25, Defendant Dussault beneficially owned approximately $135,191 worth of Desktop Metal stock.

30.     For the 2021 Fiscal Year, Defendant Dussault received $200,002 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $140,002 in stock awards.

31.     The Company's 2023 Proxy Statement stated the following about Defendant Dussault:

> **_Scott Dussault_**
> Mr. Dussault has served as a member of our Board of Directors since December 2020. Mr. Dussault has served as Chief Financial Officer of Workhuman since June 2021. He was previously Executive Vice President, Chief Operating Officer and Chief Financial Officer of Nasuni Corporation since January 2015. He was previously Executive Vice President and Chief Financial Officer at Demandware, Inc. Prior to Demandware, Mr. Dussault was CFO at Archivas, and was also Chief

Financial Officer at Astra Tech, Inc., a wholly owned subsidiary of Astra Zeneca, and StorageNetworks. Mr. Dussault began his career with Ernst & Young LLP. Mr. Dussault holds a Bachelor of Science degree in Business Administration and Accounting from Stonehill College. We believe Mr. Dussault is qualified to serve on our Board of Directors due to his extensive leadership and management history as the chief financial officer, together with his background in public accounting.

**Defendant Eisenstein**

32.     Defendant Eisenstein has served as a Company director since July 2021. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 10, 2023, Defendant Eisenstein beneficially owned 113,398 shares of the Company's Class A common stock. Given that the price per share of the Company's stock at the close of trading on April 10, 2023 was $2.25, Defendant Eisenstein beneficially owned approximately $255,146 worth of Desktop Metal stock.

33.     For the 2021 Fiscal Year, Defendant Eisenstein received $439,382 in total compensation from the Company. This included $19,375 in fees earned or paid in cash and $420,007 in stock awards.

34.     The Company's 2023 Proxy Statement stated the following about Defendant Eisenstein:

> *James Eisenstein*
> Mr. Eisenstein has served as a member of our Board of Directors since July 2021. Mr. Eisenstein has more than 30 years of leadership experience in both public and private technology companies, including an extensive background in M&A and industrial consolidation. He has founded several multi-billion-dollar companies including American Tower Corporation (NYSE: AMT) which today has a market cap of over $120 billion, and Eaton Towers Limited, the largest tower operator in Africa until its sale in 2019 for $1.9 billion. He is currently Founder, Chairman and Chief Executive Officer of Grupo TorreSur, the largest independent wireless tower company in Latin America. Eisenstein is a graduate of Georgetown University, and he holds an M.B.A. from The Wharton School and a J.D. from the University of Pennsylvania Law School. We believe Mr. Eisenstein is qualified to serve on our Board of Directors due to his extensive management and international experience and experience as a public-company director.

**Defendant Grayson**

35.     Defendant Grayson has served as a Company director since October 2015. She also serves as the Chair of the Compensation Committee. According to the 2023 Proxy Statement, as of April 10, 2023, Defendant Grayson beneficially owned 119,596 shares of the Company's Class A common stock. Given that the price per share of the Company's stock at the close of trading on April 10, 2023 was $2.25, Defendant Grayson beneficially owned approximately $269,091 worth of Desktop Metal stock.

36.     For the 2021 Fiscal Year, Defendant Grayson received $195,002 in total compensation from the Company. This included $55,000 in fees earned or paid in cash and $140,002 in stock awards.

37.     The Company's 2023 Proxy Statement stated the following about Defendant Grayson:

> ***Dayna Grayson***
> Ms. Grayson has served as a member of our Board of Directors since December 2020. Ms. Grayson is a Managing Partner of Construct Capital, a venture capital firm she co-founded in 2020. Prior to that, Ms. Grayson served as a Partner of New Enterprise Associates from 2012 to 2020. Ms. Grayson currently serves on the boards of directors of numerous private companies. Ms. Grayson holds an M.S. from the University of Virginia and an M.B.A. from Harvard Business School. We believe Ms. Grayson is qualified to serve on our Board of Directors due to her extensive experience in identifying, investing in and building next-generation technologies and companies.

**Defendant Hindery, Jr.**

38.     Defendant Hindery, Jr. served as a Company director from September 2018 until he resigned effective August 11, 2022. Prior to his resignation, he served as the Company's CEO and Chairman from September 2018 until December 2020. According to the 2023 Proxy Statement, as of April 10, 2023, Defendant Hindery, Jr. beneficially owned 15,368 shares of the Company's Class A common stock. Given that the price per share of the Company's stock at the

close of trading on April 10, 2023 was $2.25, Defendant Hindery, Jr. beneficially owned approximately $34,578 worth of Desktop Metal.

39.     For the 2021 Fiscal Year, Defendant Hindery, Jr. received $180,002 in total compensation from the Company. This included $40,000 in fees earned or paid in cash and $140,002 in stock awards.

40.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hindery, Jr. made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 17, 2021 | 250,000 | $19.35 | $4,838,000 |

His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in scheme.

41.     The Company's 2022 Proxy Statement stated the following about Defendant Hindery, Jr.:

> ### *Leo Hindery, Jr.*
> Mr. Hindery has served as a member of our Board of Directors since September 2018. From September 2018 until December 2020, Mr. Hindery served as our CEO and Chairman. In January 1988, Mr. Hindery founded, and ran as Managing Partner, InterMedia Partners, a series of media industry investment funds. In February 1997, he was named President and CEO of Tele-Communications, Inc. (TCI), a cable television system operator. In March 1999, TCI merged into AT&T and Mr. Hindery became President and CEO of AT&T Broadband. In November 1999, Mr. Hindery was named Chairman and CEO of GlobalCenter Inc., an Internet services company, which merged into Exodus Communications, Inc. Following this merger, until October 2004, he was the founding Chairman and CEO of The YES Network, after which he reconstituted and ran InterMedia Partners until our incorporation. He is a member of the Council on Foreign Relations and a Director of Hemisphere Media Group, Inc. Mr. Hindery has an MBA from the Stanford University Graduate School of Business and received an undergraduate degree from Seattle University. We believe Mr. Hindery is qualified to serve on our Board of Directors due to his extensive industry and board experience.

**Defendant Hsieh**

42.      Defendant Hsieh has served as a Company director since April 2016. He also serves as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of April 10, 2023, Defendant Hsieh beneficially owned 17,707,118 shares of the Company's Class A common stock, representing 5.52% of the Company's total outstanding Class A Common Stock as of that date. Given that the price per share of the Company's stock at the close of trading on April 10, 2023 was $2.25, Defendant Hsieh beneficially owned approximately $39,841,016 worth of Desktop Metal stock.

43.      For the 2021 Fiscal Year, Defendant Hsieh received $187,502 in total compensation from the Company. This included $47,500 in fees earned or paid in cash and $140,002 in stock awards.

44.      During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hsieh made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| June 15, 2021 | 100,000 | $12.12 | $1,211,600 |

His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in scheme.

45.      The Company's 2023 Proxy Statement stated the following about Defendant Hsieh:

***Wen Hsieh***
Mr. Hsieh has served as a member of our Board of Directors since December 2020. Mr. Hsieh serves as General Partner of Kleiner Perkins Caufield & Byers, a venture capital firm he joined in 2006. Mr. Hsieh currently serves on the boards of directors of numerous private companies. Mr. Hsieh holds a B.S., M.S. and Ph.D. from California Institute of Technology. We believe Mr. Hsieh is qualified to serve on

our Board of Directors due to his extensive experience in identifying, investing in and building next-generation technologies and companies.

**Defendant Immelt**

46.     Defendant Immelt has served as a Company director since June 2018. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of April 10, 2023, Defendant Immelt beneficially owned 452,574 shares of the Company's Class A common stock. Given that the price per share of the Company's stock at the close of trading on April 10, 2023 was $2.25, Defendant Immelt beneficially owned approximately $1,018,292 worth of Desktop Metal stock.

47.     For the 2021 Fiscal Year, Defendant Immelt received $140,002 in total compensation from the Company. This included $140,002 in stock awards.

48.     The Company's 2023 Proxy Statement stated the following about Defendant Immelt:

*Jeff Immelt*
Mr. Immelt has served as a member of our Board of Directors since December 2020. Mr. Immelt serves as Venture Partner at New Enterprise Associates, a venture capital firm he joined in 2018. Mr. Immelt previously served as Chief Executive Officer of General Electric Co. and in various other roles with General Electric Co. from 2001 to 2017. Mr. Immelt currently serves on the boards of directors at Twilio Inc. and Bloom Energy Corp., in addition to numerous private companies. Mr. Immelt holds a B.A. from Dartmouth College and an M.B.A. from Harvard Business School. We believe Mr. Immelt is qualified to serve on our Board of Directors due to his extensive leadership and management history as the chief executive officer of a Fortune 500 company and his experience as a director of numerous public and private companies, together with his background in public company governance.

**Defendant Knight**

49.     Defendant Knight served as a Company director from December 2020 until he resigned effective July 27, 2021.

50.     The Company's Annual Report on Form 10-K/A (Amendment No. 2) filed on May

17, 2021 (the "2021 10-K/A") stated the following about Defendant Knight:

**Byron Knight**

Mr. Knight has served as a member of our Board of Directors since December 2020.
Mr. Knight serves as Managing Director of Koch Disruptive Technologies, LLC, a
subsidiary and the venture capital arm of Koch Industries, Inc., which he joined in
March 2018. Mr. Knight previously worked at Georgia-Pacific, LLC as Vice
President, eCommerce from 2016 to 2018 and as General Partner, Emerging
Business from 2014 to 2016. Mr. Knight serves on the boards of directors of
numerous private companies. Mr. Knight holds a B.S. from Georgia Institute of
Technology. We believe Mr. Knight is qualified to serve on our Board of Directors
due to his extensive management history and experience in identifying and
investing in manufacturing and logistics technologies and companies.

**Defendant Nigro**

51.     Defendant Nigro has served as a Company director since December 2020.

According to the 2023 Proxy Statement, as of April 10, 2023, Defendant Nigro beneficially owned

63,901 shares of the Company's Class A common stock. Given that the price per share of the

Company's stock at the close of trading on April 10, 2023 was $2.25, Defendant Nigro beneficially

owned approximately $143,777 worth of Desktop Metal.

52.     For the 2021 Fiscal Year, Defendant Nigro received $40,000 in total compensation

from the Company. This included $40,000 in fees earned or paid in cash.

53.     The Company's 2023 Proxy Statement stated the following about Defendant Nigro:

**Stephen Nigro**

Mr. Nigro has served as a member of our Board of Directors since December 2020.
Mr. Nigro served as a consultant to Legacy Desktop Metal from August 2020. He
most recently served as President, 3D Printing at HP, Inc., an information
technology and services company, from 2015 until 2019. Mr. Nigro previously
served as the Senior Vice President of HP, Inc.'s Imaging & Printing business. Mr.
Nigro serves on the board of directors of Kornit Digital Ltd. Mr. Nigro holds a B.S.
from University of California Santa Barbara and an M.S. from Stanford University.
We believe Mr. Nigro is qualified to serve on our Board of Directors due to his
extensive management history and his leadership experience in the additive
manufacturing industry.

**Defendant Papa**

54.     Defendant Papa has served as a Company director since June 2016. He also serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 10, 2023, Defendant Papa beneficially owned 118,705 shares of the Company's Class A common stock. Given that the price per share of the Company's stock at the close of trading on April 10, 2023 was $2.25, Defendant Papa beneficially owned approximately $267,086 worth of Desktop Metal stock.

55.     For the 2021 Fiscal Year, Defendant Papa received $190,002 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $140,002 in stock awards.

56.     The Company's 2023 Proxy Statement stated the following about Defendant Papa:

**Steve Papa**
Mr. Papa has served as a member of our Board of Directors since December 2020. Mr. Papa serves as the chief executive officer of Parallel Wireless, a company he founded in 2012. Mr. Papa serves on the boards of directors of numerous private companies. Mr. Papa holds a B.S. from Princeton University and an M.B.A. from Harvard Business School. We believe Mr. Papa is qualified to serve on our Board of Directors due to his extensive management history as the founder and chief executive officer of multiple companies and his experience in identifying, investing in and building next-generation technologies and companies.

**Defendant Wheeler**

57.     Defendant Wheeler served as a Company director from December 2020 until he resigned effective July 27, 2021. Prior to his resignation, he served as a member of the Nominating and Corporate Governance Committee.

58.     The Company's 2021 10-K/A stated the following about Defendant Wheeler:

**Andy Wheeler**
Mr. Wheeler has served as a member of our Board of Directors since December 2020. Mr. Wheeler serves as general partner of GV, a venture capital firm he joined in 2012. Mr. Wheeler currently serves on the board of directors of numerous private

companies. Mr. Wheeler holds an S.B. and M.Eng. from MIT. We believe Mr. Wheeler is qualified to serve on our Board of Directors due to his extensive management history as the chief technology officer of multiple companies and his experience in identifying, investing in and building next-generation technologies and companies.

**Defendant Zuberi**

59.      Defendant Zuberi has served as a Company director since April 2016. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of April 10, 2023, Defendant Zuberi beneficially owned 75,453 shares of the Company's Class A common stock. Given that the price per share of the Company's stock at the close of trading on April 10, 2023 was $2.25, Defendant Zuberi beneficially owned approximately $169,769 worth of Desktop Metal stock.

60.      For the 2021 Fiscal Year, Defendant Zuberi received $189,425 in total compensation from the Company. This included $49,423 in fees earned or paid in cash and $140,002 in stock awards.

61.      The Company's 2023 Proxy Statement stated the following about Defendant Zuberi:

> **_Bilal Zuberi_**
> Mr. Zuberi has served as a member of our Board of Directors since December 2020. Mr. Zuberi serves as a partner at Lux Capital, a venture capital firm he joined in 2013. Mr. Zuberi currently serves on the boards of directors of numerous private companies. Mr. Zuberi holds a B.S. from The College of Wooster and a Ph.D. from MIT. We believe Mr. Zuberi is qualified to serve on our Board of Directors due to his extensive experience in identifying, investing in and building next-generation technologies and companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

62.      By reason of their positions as officers and/or directors of Desktop Metal, and because of their ability to control the business and corporate affairs of Desktop Metal, the Individual Defendants owed Desktop Metal and its shareholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Desktop Metal in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Desktop Metal and its shareholders so as to benefit all shareholders equally.

63.     Each director and officer of the Company owes to Desktop Metal and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

64.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Desktop Metal, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

65.     To discharge their duties, the officers and directors of Desktop Metal were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

66.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Desktop Metal, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

67.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

68.     To discharge their duties, the officers and directors of Desktop Metal were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Desktop Metal were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Desktop Metal's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Desktop Metal conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of Desktop Metal and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)   maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Desktop Metal's operations would comply with all applicable laws and Desktop Metal's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)   exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

69.   Each of the Individual Defendants further owed to Desktop Metal and the shareholders the duty of loyalty requiring that each favor Desktop Metal's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

70.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Desktop Metal and were at all times acting within the course and scope of such agency.

71.     Because of their advisory, executive, managerial, and directorial positions with Desktop Metal, each of the Individual Defendants had access to adverse, non-public information about the Company.

72.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Desktop Metal.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

73.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

74.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

75.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this

plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Desktop Metal was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

76.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

77.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Desktop Metal, and was at all times acting within the course and scope of such agency.

## DESKTOP METAL'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Code of Business Conduct and Ethics*

78.     The Company's Code of Conduct starts by stating:

This Code of Business Conduct and Ethics (the "Code") contains general guidelines for how we work at Desktop Metal, Inc. (the "Company" or "we") consistent with the highest standards of business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards.

79.     The Code of Conduct continues:

This Code applies to all of our directors, officers and other employees. We refer to all officers and other employees covered by this Code as "Company employees" or simply "employees," unless the context otherwise requires. In this Code, we refer to our principal executive officer, principal financial officer, principal accounting

officer and controller, or persons performing similar functions, as our "principal financial officers."

80. Under the heading "Compliance with Laws and Regulations," the Code of Conduct states, "Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, approval, manufacture, marketing and sale of our products and product candidates, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position[.]"

81. The Code of Conduct provides, as to "Conflicts of Interest," that:

Employees, officers and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.

82. The Code of Conduct provides, as to "Compliance with Insider Trading Laws," that:

Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to

trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time[.]

83.     The Code of Conduct provides, as to "Confidential Information," that:

Employees and directors have access to a variety of confidential information regarding the Company. Confidential information includes all non-public information that might be of use to competitors, or, if disclosed, harmful to the Company or its collaborators, customers or suppliers. Employees and directors have a duty to safeguard all confidential information of the Company or third parties with which the Company conducts business, except when disclosure is authorized or legally mandated. Unauthorized disclosure of any confidential information is prohibited. Additionally, employees and directors should take appropriate precautions to ensure that confidential or sensitive business information, whether it is proprietary to the Company or another company, is not communicated within the Company except to employees and directors who have a need to know such information to perform their responsibilities for the Company. An employee's and director's obligation to protect confidential information continues after he or she leaves the Company. Unauthorized disclosure of confidential information could cause competitive harm to the Company or its collaborators, customers or suppliers and could result in legal liability to you and the Company[.]

84.     The Code of Conduct provides, as to "Protection and Use of Company Assets,"

that:

Employees should protect the Company's assets and ensure their efficient use for legitimate business purposes only and not for any personal benefit or the personal benefit of anyone else. Theft, carelessness and waste have a direct impact on the Company's financial performance. The use of Company funds or assets, whether or not for personal gain, for any unlawful or improper purpose is prohibited.

Employees should be aware that Company property includes all data and communications transmitted or received to or by, or contained in, the Company's electronic or telephonic systems. Company property also includes all written communications. Employees and other users of this property should have no expectation of privacy with respect to these communications and data. To the extent permitted by law, the Company has the ability, and reserves the right, to monitor all electronic and telephonic communication. These communications may also be subject to disclosure to law enforcement or government officials.

85.     The Code of Conduct provides, as to "Company Records," that:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or the Company's General Counsel to obtain a copy of any such policy or with any questions concerning any such policy.

86.     The Code of Conduct provides, as to "Accuracy of Financial Reports and Other Public Communications," that:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

***Audit Committee Charter***

87.     The Charter of the Audit Committee of the Board of Directors of Desktop Metal (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

88.     Per the Audit Committee Charter, the purpose of the Audit Committee is:

[T]o assist the Board of Directors (the "Board") in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's independent auditor; and (v)

the design and implementation of the Company's internal audit function, and the performance of the internal audit function after it has been established.

89.     The Audit Committee Charter lists, among the Audit Committee's responsibilities:

*1. Appointment and Oversight.* The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

*2. Annual Report on Independence and Quality Control.* The Committee must, at least annually, obtain and review a report from the independent auditor describing (a) the auditing firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditing firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years relating to any independent audit conducted by the auditing firm, and any steps taken to deal with any such issues; and (c) all relationships and services between the independent auditor and the Company in order to assess the independent auditors' independence.

*          *          *

**<u>Annual Financial Statements and Annual Audit</u>**

4. *Form 10-K Review*. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
5. *Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

**<u>Quarterly Financial Statements</u>**

6. *Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the

Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Other Duties and Responsibilities**

7. *Review of Earnings Release*. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8. *Risk Assessment and Risk Management*. The Committee must discuss the Company's policies with respect to risk assessment and risk management.

12. *Review of Code of Business Conduct and Ethics*. The Committee must, at least annually, consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics and the procedures in place to enforce the Code of Ethics. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code of Business Conduct and Ethics brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

\*          \*          \*

90.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report known violations of the Code of Conduct and law.

91.     Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law,

including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background on Desktop Metal

92.     Desktop Metal is a Delaware corporation based in Massachusetts that designs and markets 3D printing systems. [2] The Company's platforms include: Production System, a manufacturing platform which utilizes Desktop Metal's Single Pass Jetting technology to enable production quantities of up to millions of parts per year; Shop System, a turnkey metal binder jetting system to bring metal 3D printing to machine and job shops; Studio System, an office-friendly metal 3D printing system; and Fiber, a desktop 3D printer which utilizes Desktop Metal's proprietary Micro Automated Fiber Placement.

93.     On February 6, 2021, the Company acquired EnvisionTEC, a provider of volume production photopolymer 3D printing solutions for end use parts.

---

[2] https://fortune.com/2016/04/26/term-sheet-tuesday-april-26/

**False and Misleading Statements**

***March 15, 2021 Form 10-K***

94.     On March 15, 2021, the Company filed its annual report on Form 10-K with the

SEC for the period ended December 31, 2020 (the "2020 10-K"). The 2020 10-K stated the

following, in relevant part:

> ***We may experience difficulties in integrating the operations of EnvisionTEC into
> our business and in realizing the expected benefits of the EnvisionTEC
> Acquisition.***
>
> In February 2021, we acquired EnvisionTEC, Inc., or EnvisionTEC, and certain of
> its affiliates. Additional information about our acquisition of EnvisionTEC, which
> we refer to as the EnvisionTEC Acquisition, are set forth in "Note 21. Subsequent
> Events" to our consolidated financial statements in this Annual Report on Form 10-
> K. The success of the EnvisionTEC Acquisition will depend in part on our ability
> to realize the anticipated business opportunities from combining the operations of
> EnvisionTEC with our business in an efficient and effective manner. The
> integration process could take longer than anticipated and could result in the loss
> of key employees, the disruption of each company's ongoing businesses, tax costs
> or inefficiencies, or inconsistencies in standards, controls, information technology
> systems, procedures and policies, any of which could adversely affect our ability to
> maintain relationships with customers, employees or other third parties, or our
> ability to achieve the anticipated benefits of the EnvisionTEC Acquisition, and
> could harm our financial performance. If we are unable to successfully or timely
> integrate the operations of EnvisionTEC with our business, we may incur
> unanticipated liabilities and be unable to realize the revenue growth, synergies and
> other anticipated benefits resulting from the EnvisionTEC Acquisition, and our
> business, results of operations and financial condition could be materially and
> adversely affected.
>
> We have incurred significant costs in connection with the EnvisionTEC
> Acquisition. The substantial majority of these costs are non-recurring expenses
> related to the EnvisionTEC Acquisition. These non-recurring costs and expenses
> are reflected in the unaudited pro forma condensed combined financial information
> included in this Annual Report on Form 10-K. We may incur additional costs in the
> integration of EnvisionTEC's business, and may not achieve cost synergies and
> other benefits sufficient to offset the incremental costs of the EnvisionTEC
> Acquisition.

95.     Defendants Fulop, Haley, El Siblani, Grayson, Hindery, Jr., Hsieh, Immelt, Knight, Nigro, Papa, Wheeler, and Zuberi signed the 2020 10-K which contained false and misleading statements.

### *May 17, 2021 Form 10-Q*

96.     On May 17, 2021, the Company filed its Form 10-Q with the SEC for the quarterly period ended March 31, 2021 (the "1Q21 10-Q"), reporting its first quarter earnings. The 1Q21 10-Q stated that: "EnvisionTEC's results are included in the Company's consolidated results for the period from February 16, 2021 to March 31, 2021. For this period, EnvisionTEC's net revenues were approximately $5.4 million and net loss was approximately $1.8 million."

97.     Further, the 1Q21 10-Q stated:

Total revenue for the three months ended March 31, 2021 and 2020 was $11.3 million and $3.4 million, respectively, an increase of $7.9 million, or 234%. The increase in total revenue was attributable to an increase in revenue from both products and services.

We sold more products during the three months ended March 31, 2021 as compared to three months ended March 31, 2020, leading to an approximately 283% increase in product revenue. This was primarily due to product revenue from EnvisionTEC following the close of this acquisition. Additionally, we shipped more units during the first quarter of 2021 compared to the first quarter of 2020.

98.     The 1Q21 10-Q also identified material weaknesses in the Company's internal control over its financial reporting—specifically, material weaknesses in the Company's "evaluation of disclosure controls and procedures, including internal control over financial reporting, as [the Company] do[es] not have the necessary business processes, personnel and related internal controls to operate in a manner to satisfy the accounting and financial reporting requirements of a public company."

99.     The 1Q21 10-Q stated the following, in relevant part:

**Background and Remediation of Material Weakness**

In connection with our evaluation of disclosure controls and procedures covering our consolidated financial statements as of December 31, 2020, we identified material weaknesses in our internal control over financial reporting. We have concluded that material weaknesses exist in our evaluation of disclosure controls and procedures, including internal control over financial reporting, as we do not have the necessary business processes, personnel and related internal controls to operate in a manner to satisfy the accounting and financial reporting requirements of a public company. ***These material weaknesses primarily manifested in the improper segregation of duties relating to the recording of journal entries and the reconciliation of key accounts, as well as the analysis of certain transactions and accounts, and the safeguarding of assets. We identified an additional material weakness related to the design and operating effectiveness of controls over our accounting for significant and complex accounting matters***.[3]

We are focused on designing and implementing effective internal controls measures to improve our evaluation of disclosure controls and procedures, including internal control over financial reporting, and remediate the material weaknesses. In order to remediate these material weaknesses, we have taken and plan to take the following actions:

- the hiring and continued hiring of additional accounting, finance and legal resources with public company experience; and

- implementation of additional review controls and processes requiring timely account reconciliation and analyses of certain transactions and accounts.

These actions and planned actions are subject to ongoing evaluation by management and will require testing and validation of design and operating effectiveness of internal controls over financial reporting over future periods. We are committed to the continuous improvement of our internal control over financial reporting and will continue to review the internal controls over financial reporting.

\*               \*               \*

**Changes in Internal Control Over Financial Reporting**

On February 16, 2021, we completed the acquisition of EnvisionTEC. We are in the process of integrating EnvisionTEC into our system of internal control over financial reporting. Except for the material weaknesses noted above and the acquisition of EnvisionTEC, there were no changes to our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that occurred during the quarter ended March 31, 2021 that have materially affected, or

---

[3] Emphasis added.

are reasonably likely to materially affect, our internal control over financial reporting.

**June 17, 2021 Proxy Statement**

100.    On June 17, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Fulop, Grayson, Hindery, Jr., Hsieh, Immelt, Knight, Nigro, Papa, Wheeler, and Zuberi solicited the 2021 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

101.    The 2021 Proxy Statement called for Company shareholders to vote for, *inter alia*: (1) the re-election of directors Grayson, Papa, and Zuberi to the Board; and (2) the ratification of the appointment of Deloitte & Touche as the Company's independent auditors for the 2021 Fiscal Year.

102.    The 2021 Proxy Statement also described the directors' responsibilities and the duties of the different committees—specifically, the Audit Committee, the Nominating and Corporate Governance Committee, and the Compensation Committee. Regarding the Board's role in risk oversight, the 2021 Proxy Statement stated the following:

> Our Board of Directors is responsible for overseeing our risk management process. Our Board of Directors focuses on our general risk management strategy, the most significant risks facing us, and oversees the implementation of risk mitigation strategies by management. Our Audit Committee is also responsible for discussing our policies with respect to risk assessment and risk management. Our Board of Directors believes its administration of its risk oversight function has not negatively affected our Board of Directors leadership structure.

103.    The 2021 Proxy Statement also highlighted the Board's risk management processes and the Company's "Code of Business Conduct and Ethics," stating:

> We adopted a written code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of the code is posted on our corporate website

at www.desktopmetal.com/investors. In addition, we intend to post on our website all disclosures that are required by law or the NYSE listing standards concerning any amendments to, or waivers from, any provision of the code. The information contained in, or accessible through, our website does not constitute a part of this prospectus. We have included our website address in this prospectus solely as an inactive textual reference.

104.    The "Code of Business Conduct and Ethics" section of the 2021 Proxy Statement referred back to the Company's Code of Conduct, which specifically states that "[a]ll Company records must be complete, accurate and reliable in all material respects," including SEC filings.

105.    The 2021 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2021 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

106.    The 2021 Proxy Statement also failed to disclose, *inter alia*, that: (1) there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures; (2) the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

107.    As a result of Defendants Fulop, Grayson, Hindery, Jr., Hsieh, Immelt, Knight, Nigro, Papa, Wheeler, and Zuberi causing the 2021 Proxy Statement to be false and misleading,

Company shareholders voted, *inter alia*, to re-elect Defendants Grayson, Papa, and Zuberi to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

### *August 11, 2021 Form 10-Q*

108.   On August 11, 2021, the Company filed a Form 10-Q with the SEC for the quarterly period ended June 30, 2021 (the "2Q21 10-Q"), reporting its second quarter earnings. The 2Q21 10-Q stated that: "EnvisionTEC's results are included in the Company's consolidated results for the period from February 16, 2021 to June 30, 2021. For this period, EnvisionTEC's net revenues were approximately $15.7 million and net loss was approximately $4.8 million."

109.   Further, the 2Q21 10-Q also identified material weaknesses in the Company's internal control over its financial reporting, specifically material weaknesses in its "evaluation of disclosure controls and procedures, including internal control over financial reporting, as [the Company] do[es] not have the necessary business processes, personnel and related internal controls to operate in a manner to satisfy the accounting and financial reporting requirements of a public company."

110.   The 2Q21 10-Q also stated the following regarding the Company's controls and procedures:

> **Background and Remediation of Material Weakness**
> In connection with our evaluation of disclosure controls and procedures covering our consolidated financial statements as of December 31, 2020, we identified material weaknesses in our internal control over financial reporting. We have concluded that material weaknesses exist in our evaluation of disclosure controls and procedures, including internal control over financial reporting, as we do not have the necessary business processes, personnel and related internal controls to operate in a manner to satisfy the accounting and financial reporting requirements of a public company. ***These material weaknesses primarily manifested in the improper segregation of duties relating to the recording of journal entries and the reconciliation of key accounts, as well as the analysis of certain transactions and accounts, and the safeguarding of assets. We identified an additional***

***material weakness related to the design and operating effectiveness of controls over our accounting for significant and complex accounting matters.*[4]**

We are focused on designing and implementing effective internal controls measures to improve our evaluation of disclosure controls and procedures, including internal control over financial reporting, and remediate the material weaknesses. In order to remediate these material weaknesses, we have taken and plan to take the following actions:

- the hiring and continued hiring of additional accounting, finance and legal resources with public company experience; and
- implementation of additional review controls and processes requiring timely account reconciliation and analyses of certain transactions and accounts.

These actions and planned actions are subject to ongoing evaluation by management and will require testing and validation of design and operating effectiveness of internal controls over financial reporting over future periods. We are committed to the continuous improvement of our internal control over financial reporting and will continue to review the internal controls over financial reporting.

111.    The statements referenced above in ¶¶ 94-99 and 108-110 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures; (2) the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

---

[4] Emphasis added.

***November 8, 2021 Form 8-K -- Filed November 4, 2021***

112.    On November 8, 2021, the Company filed a Form 8-K dated November 4, 2021

disclosing that it was conducting an internal investigation into certain matters, including

"manufacturing and product compliance practices and procedures with respect to a subset of its

photopolymer equipment and materials at its EnvisionTec US LLC facility in Dearborn,

Michigan." Specifically, the 8-K stated:

> On November 4, 2021, the Audit Committee of the Board of Directors of Desktop
> Metal, Inc. (the "Company") engaged a third party to conduct an independent
> internal investigation as a result of a whistleblower complaint relating to, among
> other matters, manufacturing and product compliance practices and procedures
> with respect to a subset of its photopolymer equipment and materials at its
> EnvisionTec US LLC facility in Dearborn, Michigan. While the investigation
> remains on-going, the Company has taken initial actions, including implementing
> changes in the management of and procedures associated with manufacturing the
> applicable products. Based on the investigation to date, the Company does not
> believe the matters involved will have a material impact on the Company, its
> financial statements or its business.

***November 8, 2021 Form 8-K -- Filed November 5, 2021***

113.    Later on November 8, 2021, the Company filed a second Form 8-K dated

November 5, 2021, disclosing the resignation of Defendant El Siblani as CEO of EnvisionTEC

US LLC and as a director of Desktop Metal. Specifically, it stated:

> On November 5, 2021, Ali El Siblani notified Desktop Metal, Inc. (together with
> its subsidiaries, the "Company") of his intent to resign as a member of the
> Company's Board of Directors and as an employee of the Company in his role as
> Chief Executive Officer of EnvisionTec US LLC. The decision of Mr. Siblani was
> not the result of any disagreement relating to the Company's operations, policies or
> practices.

114.    On this news, the Company's stock price fell $0.39 per share, or 4.24%, from a

closing price of $9.20 per share on November 8, 2021 to close at $8.81 per share on November

9, 2021.

## THE TRUTH EMERGES

### *November 15, 2021 Form 10-Q*

115.    The truth emerged on November 15, 2021 when the Company filed the 3Q21 10-Q

with the SEC, revealing that Desktop Metal would notify the FDA of "compliance issues with

certain shipments of EnvisionTEC's Flexcera dental resins and its PCA4000 curing box."

116.    Further, the 3Q21 10-Q stated:

On November 4, 2021, the Audit Committee of the Board of Directors engaged a
third party to conduct an independent internal investigation as a result of a
whistleblower complaint relating to, among other matters, manufacturing and
product compliance practices and procedures with respect to a subset of its
photopolymer equipment and materials at its EnvisionTec US LLC facility in
Dearborn, Michigan. While the investigation remains on-going, the Company has
taken initial actions, including implementing changes in the management of and
procedures associated with manufacturing the applicable products. Based on the
investigation to date, the Company does not believe the matters involved will have
a material impact on the Company, its financial statements or its business.

On November 5, 2021, Ali El Siblani notified the Company of his intent to resign
as a member of the Company's Board of Directors and as an employee of the
Company in his role as Chief Executive Officer of EnvisionTec US LLC. The
decision of Mr. Siblani was not the result of any disagreement relating to the
Company's operations, policies or practices.

As of November 12, 2021, based on compliance issues with certain shipments of
EnvisionTEC's Flexcera dental resins and its PCA4000 curing box, the Company
has determined that it will notify the FDA and consult with them on the appropriate
voluntary market action with respect to these products. The Company does not
expect the costs of any such market action to have a material impact on its financial
statements.

117.    On this news, the Company's stock price fell $1.19 per share, or 14.84%, from a

closing price of $8.02 per share on November 15, 2021 to close at $6.83 per share on November

16, 2021. Additionally, an unusually heavy volume of stocks was also traded – nearly twice the

typical number of shares that had been trading.

## DAMAGES TO DESKTOP METAL

118.    As a direct and proximate result of the Individual Defendants' conduct, Desktop Metal has lost and will continue to lose and expend many millions of dollars.

119.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

120.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

121.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, including its non-compliance with FDA regulations, and payments of any fines or settlement amounts associated with the Company's violations.

122.    As a direct and proximate result of the Individual Defendants' conduct, Desktop Metal has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendant's breaches of fiduciary duties and unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement.

## DERIVATIVE ALLEGATIONS

123.    Plaintiffs bring this action derivatively and for the benefit of Desktop Metal to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of

their fiduciary duties as directors and/or officers of Desktop Metal, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Section 14(a) of the Exchange Act, and SEC Rule 14a-9, and for contribution under Sections 10(b) and 21D of the Exchange Act .

124.    Desktop Metal is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

125.    Plaintiffs are, and have been at all relevant times, shareholders of Desktop Metal. Plaintiffs will adequately and fairly represent the interests of Desktop Metal in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

126.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

127.    A pre-suit demand on the Board of Desktop Metal is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Fulop, Dussault, Eisenstein, Grayson, Hsieh, Immelt, Nigro, Papa, and Zuberi (the "Director Defendants"). Plaintiffs need only to allege demand futility as to five of nine Director Defendants who are on the Board at the time this action is commenced.

128.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. Furthermore, while the price of the Company's stock was artificially inflated by their misconduct, one of the Director Defendants

further breached his fiduciary duties by engaging in insider sales of the Company's common stock, which caused him to receive over $1,211,600 in proceeds, and which further demonstrates his motives for facilitating and participating in the scheme. All of the above renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

129.   In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Desktop Metal to issue materially false and misleading statements. Specifically, the Director Defendants caused Desktop Metal to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

130.   Additional reasons that demand on Defendant Fulop is futile follow. Defendant Fulop currently serves as the Company's CEO and has served as a Company director since December 2020. He also served as the CEO of Legacy Desktop Metal from its incorporation in 2015. As such, the Company provided Defendant Fulop with his principal occupation during the Relevant Period for which he received lucrative compensation, including $11,034,910 for the 2021 Fiscal Year. Thus, as the Company admits, he is a non-independent director. As CEO throughout the Relevant Period, Defendant Fulop was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company. In addition, Defendant Fulop signed the 2020 10-K and solicited the 2021 Proxy Statement, both of which contained false and misleading elements. As the Company's highest officer and as a trusted director, he conducted

little, if any, oversight of the Company's engagement in the scheme to issue materially false and/or misleading statements and omissions and consciously disregarded his duties to maintain internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Fulop is a defendant in the Securities Class Action. For these reasons, too, Defendant Fulop breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Dussault is futile follow. Defendant Dussault has served as a Company director since December 2020. He also serves as the Chair of the Audit Committee. Defendant Dussault received and continues to receive compensation for his role as a director, including $200,002 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Dussault signed the 2020 10-K and solicited the 2021 Proxy Statement, both of which contained false and misleading elements. For these reasons, Defendant Dussault breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Eisenstein is futile follow. Defendant Eisenstein has served as a Company director since July 2021. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Eisenstein received and continues to receive compensation for his role as a director, including $439,382 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in

the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Eisenstein solicited the 2021 Proxy Statement which contained false and misleading statements. For these reasons, Defendant Eisenstein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Grayson is futile follow. Defendant Grayson has served as a Company director since October 2015. She also serves as the Chair of the Compensation Committee. Defendant Grayson received and continues to receive compensation for her role as a director, including $195,002 for the 2021 Fiscal Year. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Grayson signed the 2020 10-K and solicited the 2021 Proxy Statement, both of which contained false and misleading elements that (as to the latter) contributed, *inter alia*, to shareholders re-electing her to the Board. For these reasons, Defendant Grayson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

134.    Additional reasons that demand on Defendant Hsieh is futile follow. Defendant Hsieh has served as a Company director since April 2016. He also serves as a member of the Compensation Committee. Defendant Hsieh received and continues to receive compensation for his role as a director, including $187,502 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false

and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Hsieh signed the 2020 10-K and solicited the 2021 Proxy Statement, both of which contained false and misleading elements. In addition, Defendant Hsieh's insider sales, which yielded approximately $1.2 million in proceeds, demonstrate his motive in facilitating and participating in the scheme. For these reasons, too, Defendant Hsieh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

135.    Additional reasons that demand on Defendant Immelt is futile follow. Defendant Immelt has served as a Company director since June 2018. He also serves as a member of the Audit Committee. Defendant Immelt received and continues to receive compensation for his role as a director, including $140,002 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Immelt signed the 2020 10-K and solicited the 2021 Proxy Statement, both of which contained false and misleading elements. For these reasons, Defendant Immelt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

136.    Additional reasons that demand on Defendant Nigro is futile follow. Defendant Nigro has served as a Company director since December 2020. Defendant Nigro received and continues to receive compensation for his role as a director, including $40,000 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the Company's

engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Nigro signed the 2020 10-K and solicited the 2021 Proxy Statement, both of which contained false and misleading elements. For these reasons, Defendant Nigro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

137.    Additional reasons that demand on Defendant Papa is futile follow. Defendant Papa has served as a Company director since June 2016. He also serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Papa received and continues to receive compensation for his role as a director, including $190,002 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Papa signed the 2020 10-K and solicited the 2021 Proxy Statement, both of which contained false and misleading elements that (as to the latter) contributed, *inter alia*, to shareholders re-electing him to the Board. Lastly, Defendant Papa serves as the trustee for several trusts established by Defendant Fulop, making him unlikely to take action against Defendant Fulop for the wrongdoing alleged herein. For these reasons, Defendant Papa breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

138.    Additional reasons that demand on Defendant Zuberi is futile follow. Defendant Zuberi has served as a Company director since April 2016. He also serves as a member of the

Audit Committee. Defendant Zuberi received and continues to receive compensation for his role as a director, including $189,425 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Zuberi signed the 2020 10-K and solicited the 2021 Proxy Statement, both of which contained false and misleading elements that (as to the latter) contributed, *inter alia*, to shareholders re-electing him to the Board. For these reasons, Defendant Zuberi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

139.    Additional reasons that demand on the Board is futile follow.

140.    As demonstrated by the following chart of beneficial share ownership below, Defendants Fulop, Dussault, Eisenstein, Grayson, Hsieh, Immelt, Nigro, Papa, and Zuberi are inextricably linked through their business dealings when it comes to Desktop Metal and each other. As such, Defendants Fulop, Dussault, Eisenstein, Grayson, Hsieh, Immelt, Nigro, Papa, and Zuberi lack the independence required to impartially consider a demand by Plaintiffs due to their longstanding business relationships.

| Name of Beneficial Owner | Shares Beneficially Owned | |
|---|---|---|
| | Number of Shares of Class A Common Stock Beneficially Owned | Percentage Ownership of Outstanding Class A Common Stock |
| **5% or Greater Stockholders** | | |
| KPCB Holdings, Inc., as nominee[1] | 17,631,665 | 5.50% |
| Entities affiliated with The Vanguard Group[2] | 22,051,032 | 6.87% |
| Entities affiliated with BlackRock[3] | 20,629,705 | 6.43% |
| | | |
| **Named Executive Officers and Directors** | | |
| Ric Fulop[4] | 22,173,559 | 6.91% |
| Jason Cole[5] | 32,401 | * |
| Jonah Myerberg[6] | 3,331,043 | 1.04% |
| Thomas Nogueira [7] | 242,743 | * |
| Scott Dussault[8] | 60,085 | * |
| James Eisenstein[9] | 113,398 | * |
| Dayna Grayson[10] | 119,596 | * |
| Wen Hsieh[1] [11] | 17,707,118 | 5.52% |
| Jeff Immelt[12] | 452,574 | * |
| Stephen Nigro[13] | 63,901 | * |
| Steve Papa[14] | 118,705 | * |
| Bilal Zuberi[15] | 75,453 | * |
| James Haley[16] | 100,000 | * |
| Arjun Aggarwal[17] | 370,786 | * |
| Michael Jafar | — | * |
| Leo Hindery, Jr.[18] | 15,368 | * |
| All executive officers and directors as a group (12 persons)[19] | 44,490,576 | 13.87% |

141.    Defendant Hsieh serves as General Partner of KPCB, the Company's fifth largest shareholder (as of the date of filing of the 2023 Proxy Statement).

142.    Likewise, Defendant Immelt serves as a Venture Partner at New Enterprise Associates, the Company's largest as of the 2021 Proxy Statement.

143.    Meanwhile, Defendant Zuberi serves as a partner at Lux Capital, the Company's third largest shareholder behind only New Enterprise Associates and Defendant Fulop as of the 2021 Proxy Statement.

144.    Defendants Dussault, Immelt, and Zuberi (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and

regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

145.    In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

146.    Desktop Metal has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Desktop Metal any part of the damages Desktop Metal suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

147.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

148.    The acts complained of herein constitute violations of fiduciary duties owed by Desktop Metal's officers and directors, and these acts are incapable of ratification.

149.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Desktop Metal. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Desktop Metal, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

150.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Desktop Metal to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

151.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

152.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

153.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

154.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

155.    Under the direction and watch of the Director Defendants, the 2021 Proxy Statement failed to disclose that, contrary to the 2021 Proxy Statement's descriptions of the Board's oversight function for risk management and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct.

156.    Under the direction and watch of the Director Defendants, the 2021 Proxy Statements also failed to disclose, *inter alia*, that: (1) there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures; (2) the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

157.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the re-election of Defendants Grayson, Papa, and Zuberi to the Board.

158.    The false and misleading elements of the 2021 Proxy Statement led to, among other things, the re-election of the Defendants Grayson, Papa, and Zuber, which allowed them to continue to breach their fiduciary duties to Desktop Metal.

159.    The Company was damaged as a result of Individual Defendants' material misrepresentations and omissions in the 2021 Proxy Statement.

160.    Plaintiffs, on behalf of Desktop Metal, have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

161.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

162.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Desktop Metal's business and affairs.

163.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

164.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Desktop Metal.

165.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Desktop Metal's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures; (2) the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially

misleading and/or lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

166.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

167.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

168.    In yet further breach of their fiduciary duties, during the Relevant Period, two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $6.05 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

169.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

170.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the

Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

171.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

172.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Desktop Metal has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173.    Plaintiffs, on behalf of Desktop Metal, have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

174.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

175.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Desktop Metal.

176.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Desktop Metal that was tied to the performance or artificially inflated valuation of Desktop Metal, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

177.    Plaintiffs, as shareholders and representatives of Desktop Metal, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

178.     Plaintiffs, on behalf of Desktop Metal, have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

179.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

180.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

181.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

182.     Plaintiffs, on behalf of Desktop Metal, have no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

183.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

184.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Desktop Metal, for which they are legally responsible.

185.     As a direct and proximate result of the Individual Defendants' abuse of control, Desktop Metal has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.     Plaintiffs, on behalf of Desktop Metal, have no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

187.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

188.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Desktop Metal in a manner consistent with the operations of a publicly held corporation.

189.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Desktop Metal has sustained and will continue to sustain significant damages.

190.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

191.    Plaintiffs, on behalf of Desktop Metal, have no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Fulop, Haley, and El Siblani for Contribution Under Sections 10(b) and 21D of the Exchange Act

192.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

193.    Desktop Metal, Defendant Fulop, Defendant Haley, and Defendant El Siblani are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in

part due to Defendant Fulop, Defendant Haley, and Defendant El Siblani's willful and/or reckless violations of their obligations as officers and/or directors of Desktop Metal.

194.     Defendants Fulop, Defendant Haley, and Defendant El Siblani, because of their positions of control and authority as officers and/or directors of Desktop Metal, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Desktop Metal, including the wrongful acts complained of herein and in the Securities Class Action.

195.     Accordingly, Defendants Fulop, Defendant Haley, and Defendant El Siblani are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

196.     As such, Desktop Metal is entitled to receive all appropriate contribution or indemnification from Defendants Fulop, Defendant Haley, and Defendant El Siblani.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiffs may maintain this action on behalf of Desktop Metal, and that Plaintiffs are adequate representatives of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Desktop Metal;

(c)     Determining and awarding to Desktop Metal the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Desktop Metal and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with

applicable laws and to protect Desktop Metal and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

> 2. a provision to permit the shareholders of Desktop Metal to nominate at least five candidates for election to the Board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Desktop Metal restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: November 21, 2023

Of Counsel:


**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com


*Attorneys for Plaintiffs*